


# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

STEVEN DAVIS,
    *Plaintiff,*

vs.

Members of the
GOVERNMENTAL ETHICS COMMISSION,
in their official capacities,
    *Defendants.*

Case No. 18-4022-SAC-KGS

## COMPLAINT FOR DECLARATORY RELIEF

COMES NOW Plaintiff Steven Davis, *pro se*, and for his cause of action states as follows:

### Nature of the Action

1. This is an action under 42 U.S.C. § 1983 seeking a determination and declaration that (1) Kansas's policy of allowing candidates to transfer campaign funds from one election cycle to the next is unconstitutional in violation of the Fourteenth Amendment to the United States Constitution, and (2) Kansas's prohibition on candidates soliciting or accepting donations from non-individual persons during the legislative session is unconstitutional in violation of the First and Fourteenth Amendments to the United States Constitution.

### Parties

2. Plaintiff Steven Davis ("Davis") is a citizen of Douglas County, Kansas who is running for the 45th District of the Kansas House of Representatives ("the 45th District"). As a candidate for state office who has appointed a treasurer, Davis is subject to the strictures of the Campaign Finance Act, K.S.A. 25-4142 *et seq.* ("the CFA"), and any advisory opinions, rules, and

1

regulations issued by the Governmental Ethics Commission ("the GEC") under the CFA.

3. Defendants are the members of the GEC, the agency of the State of Kansas tasked with implementing and enforcing the CFA. K.S.A. 25-4119a. The GEC is appointed by various state officials and currently consists of Dan Harden, Jerome Hellmer, Kyle Krull, Todd Scharnhorst, Kenneth Moore, John Solbach, Marisel Walston, Jane Deterding, and Amy James.

4. The members of the GEC are sued severally in their official capacities. Service of this complaint was made on the Attorney General of Kansas pursuant to Fed. R. Civ. P. 4(j)(2)(B) and K.S.A. 60-304(d)(5). Because the state's attorney general is representing the Defendants, service under Fed. R. Civ. P. 5.1(a)(1)(B) is unnecessary.

## Jurisdiction and Venue

5. This Court has jurisdiction under 28 U.S.C. § 1331 because this case presents a federal question relating to Davis's civil rights as guaranteed by the First and Fourteenth Amendments.

6. Declaratory relief is appropriate under 28 U.S.C. § 2201.

7. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim took place in the District of Kansas.

## Background

8. Davis launched his candidacy for the 45th District on January 18, 2018, by appointing a treasurer and filing the appointment with the Kansas Secretary of State. K.S.A. 25-4143(a)(1). Davis's campaign account necessarily started with a balance of $0. K.S.A. 25-4146(b)(1).

9. Representative Tom Sloan ("Sloan") is the incumbent representative for the 45th District. Sloan was first elected to the Kansas House of Representatives on November 8, 1994 and has served continuously in that capacity since January 9, 1995.

10. According to the GEC's website,[1] Sloan appointed his current treasurer on March 1, 2016. As of December 31, 2017, Sloan reported having a balance of $30,357.13 in his campaign account. Because Sloan has appointed a treasurer and his campaign account has not been terminated, he, like Davis, is subject to the CFA.

11. During the 2018 primary election period, Davis and Sloan share the same restrictions on the amount of contributions they can accept from various contributors. Specifically, they can each receive no more than $500 from any person other than a party committee, K.S.A. 25-4153(a)(2), and no more than $500 from a party committee if the primary is contested (collectively, "the contribution cap"). K.S.A. 25-4153(g)(2). Intentionally accepting contributions in excess of the contribution cap is a Class A misdemeanor. K.S.A. 25-4170.

12. Furthermore, Davis and Sloan are both forbidden from accepting or knowingly soliciting contributions from lobbyists, political committees, or non-individual persons (collectively "organizations") between January 1 and the adjournment *sine die* of the legislature in any calendar year or during any special session of the legislature ("the session restriction"). K.S.A. 25-4153a. Defying the session restriction does not appear to be a crime. *See* K.S.A. 25-4170.

13. Both the contribution cap and the session restriction apply only to contributions, as defined in K.S.A. 25-4143(e), but not other receipts. *See* K.S.A. 25-4143(l). A candidate who violates either can be penalized with a civil fine to be assessed by the GEC. K.S.A. 25-4181. A candidate who fails to pay the fine is ineligible to become a candidate for state or local office in subsequent elections. *Id.*

14. K.A.R. 19-22-1(a) states, "[T]he carryover of funds or inventory by a candidate,

---

[1] All campaign finance documents and data referenced in this complaint were retrieved from https://ethics.kansas.gov/campaign-finance/view-submitted-forms-and-reports/ (March 17, 2018)

candidate committee, party committee or political committee from one election period to another or the transfer thereof to a bona fide successor committee or candidacy does not constitute a contribution." K.A.R. 19-22-2 further states, "[T]he transfer of funds from an existing committee to its successor" constitutes an "other receipt." The GEC regulations codify an earlier GEC advisory opinion, GEC Op. No. 76-3, which overruled GEC Op. No. 74-21.

15. In 2003, the Kansas Supreme Court interpreted the CFA and the GEC regulations as allowing "the transfer of campaign contributions from a candidate's campaign account for a specific office to the same candidate's campaign account for election to that same office." *Cole v. Mayans*, 276 Kan. 866, 881–82, 80 P.3d 384 (2003). Such transfers are allowable whether the candidate wins or loses the election. *Id.* at 882.

16. In effect, the CFA, as implemented and interpreted, enables candidates with extant committees to transfer unlimited funds from past to future candidacies, provided the funds were originally raised in accordance with the CFA ("the transfer policy"). There is no apparent limit on the number of times funds can be transferred.

### Count I
### The transfer policy violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

17. The Fourteenth Amendment states, in relevant part, that no state shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249 (1985).

18. As candidates for the same office, Davis and Sloan are similarly situated under the CFA. This is so even though Davis and Sloan are currently running in different primary elections; the CFA defines a candidate as anyone seeking nomination *or* election and applies to all candidates

regardless of whether they are on the ballot during a given cycle. K.S.A. 25-4143(a), 25-4153(h). Indeed, GEC filings do not include information about candidates' political party affiliations.

19. Despite the fact that Davis and Sloan are similarly situated, the CFA enabled Sloan to transfer a reported $27,361.54 in contributions from his successful 2016 campaign to his 2018 campaign because his account existed prior to January 1, 2017.

20. The CFA therefore creates two classes of candidates: those with extant campaign accounts at the start of the primary election period ("prior candidates") and those without ("challengers"). Almost all winning legislative candidates[2] reported transferring at least some funds from the 2016 general election period to the 2018 primary election period, as did several losing candidates, many of whom were incumbents at the time of the 2016 general election.

21. In addition to providing prior candidates a significant head start, the disparate treatment of the two classes causes the contribution cap and the session restriction to weigh more heavily on challengers. A challenger might have greater support from the electorate in 2018 yet fail to mount a successful challenge because the incumbent has transferred an insurmountable level of funds from the previous election cycle despite a lack of current support.

22. For instance, suppose an incumbent has transferred $50,000 in residual funds. Assuming for the sake of argument that the incumbent has absolutely no support from the electorate and the challenger has 99 donors each willing to donate the maximum $500 during the primary election period, the challenger will still be at a financial disadvantage.

23. If the incumbent instead raises an additional $20,000 from 40 donors (some of whom may have donated in previous election cycles), the challenger must now find at least 140 new

---

[2] The exceptions were Rep. K.C. Ohaebosim, who filed an affidavit of exemption under K.S.A. 25-4173, and former Rep. S. Mike Kiegerl, who retired for health reasons on February 15, 2017.

donors to match the incumbent's resources. In other words, the CFA requires challengers to marshal *greater* support in order to have *the same* influence as an incumbent.

24. The transfer policy also causes the session restriction to hamper challengers more than prior candidates. When prior candidates have tens or even hundreds of thousands of dollars in their war chests from the previous election, their inability to raise funds from lobbyists and organizations during the legislative session is inconsequential because they can simply spend their retained funds during the session and resume fundraising after adjournment *sine die*.

25. In short, the CFA's preferential treatment of prior candidates grants them substantial advantages over challengers in clear violation of the Equal Protection Clause.

26. The Supreme Court has not squarely confronted the question of equal protection with respect to campaign finance restrictions. Notably, in *Davis v. Federal Election Commission*, the Supreme Court expressly declined to address a candidate's equal protection claim under the Fifth Amendment because his First Amendment challenge was sufficient. 554 U.S. 724, 744 n.9, 128 S.Ct. 2759 (2008).

27. In *Riddle v. Hickenlooper*, this circuit acknowledged the absence of a clear precedent from *Davis* and similar cases and analyzed the relevant campaign finance restrictions on an exacting scrutiny basis, 742 F. 3d 922, 928 (10th Cir. 2014), although Judge (now Justice) Gorsuch would have applied strict scrutiny instead. *Id.* at 931–32 (Gorsuch, J., concurring). In either instance, the burden of proving constitutionality rests with the State. *Id.* at 928.

28. To survive exacting scrutiny, the law must have "a substantial relation" with "a sufficiently important governmental interest." *Doe v. Reed*, 561 U.S. 186, 196, 130 S.Ct. 2811 (2010). With respect to campaign finance laws, only one governmental interest has withstood an exacting scrutiny challenge: preventing corruption and the appearance of corruption. The State

will fail to meet its burden of proving constitutionality on this basis.

29. Indeed, the transfer of unlimited sums of money from one election to the next actually *increases* the appearance of corruption by showing that challengers will always be at a disadvantage to incumbents. It can also have a chilling effect on a challenger's supporters, who might be less amenable to contributing their money to a challenger when the incumbent has greater financial resources than the challenger can possibly obtain.

30. The Kansas Supreme Court acknowledged the fundamental unfairness of transferring massive war chests from state to local elections in *Cole*, 276 Kan. at 882, but the fairness of unlimited transfers from one election cycle to the next was otherwise upheld. This Court has a duty to invalidate the practice on Fourteenth Amendment grounds.

### Count II
### The session restriction violates the First and Fourteenth Amendments to the United States Constitution

31. On the other hand, the session restriction appears at first to be based on the compelling governmental interest of preventing the appearance of *quid pro quo* corruption. During the legislative session, contributions to legislators by special interests may seem like contemporaneous, if conspicuous, compensation for favorable votes.[3] Ostensibly, the law applies equally to all candidates,[4] and it could potentially survive the rational basis test on those grounds. K.S.A. 25-4153a(a)(1)–(2).

32. But the law implicates the First Amendment rights of challengers and their supporters by restricting campaign contributions, so it must be "closely drawn to avoid unnecessary

---

[3] Of course, it is also possible that an organization could choose to punish an incumbent after an unfavorable vote by making a contribution to the incumbent's opponent, but this practice does not present even the appearance of corruption.

[4] Notwithstanding Davis's assertions in ¶ 24.

7

abridgment of associational freedoms" under the exacting scrutiny standard of *Buckley v. Valeo*. 424 U.S. 1, 25, 96 S.Ct. 612 (1976) (per curiam); *accord Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387–88, 120 S.Ct. 897 (2000).

33. For better or worse, these protections extend to organizations, which have the right to engage in political speech even though they are not natural persons. *Citizens United v. Federal Election Com'n*, 558 U.S. 310, 343, 130 S.Ct. 876 (2010). Several factors indicate the law must fall to the ground under exacting scrutiny:

34. First, the law is indiscriminate. It forbids contributions from *any* organization, regardless of whether the organization is the subject of pending legislation. Although a contribution to a legislator on the Transportation Committee from an asphalt company seeking a lucrative state contract might give the appearance of corruption, a contribution to a legislative candidate from her family's artichoke farm in South Carolina cannot reasonably be said to resemble corruption.

35. Meanwhile, the owner of the asphalt company would be free to contribute even if his motives were corrupt. This inequitable treatment of individuals and organizations runs afoul of the Supreme Court's holding in *Citizens United* that the First Amendment does not allow "categorical distinctions based on the corporate identity of the speaker ...." 558 U.S. at 364.

36. Second, the law penalizes challengers[5] for something only incumbent legislators can do: vote on legislation for reasons that are corrupt or appear corrupt. If the State wants to police this behavior during the legislative session, it can do so without unduly restricting the First Amendment rights of challengers and their supporters, perhaps by enacting more stringent conflict-of-interest laws for state officers, requiring more detailed reports and disclosures from

---

[5] As well as statewide officers and candidates for statewide office, whose official duties, apart from the gubernatorial veto, are unrelated to the legislative session. K.S.A. 25-4153a(a)(3)–(4).

8

individuals and organizations lobbying the state, or incorporating campaign contributions into the existing anti-bribery statute, K.S.A. 21-6001.

37. Third and finally, incumbent legislators have complete control over when the legislature adjourns *sine die*. Legislators are paid per session day and have a personal financial interest in ensuring the legislative session is as long as possible. *See* K.S.A. 46-137a. It is also easier for legislators to simply postpone adjournment *sine die* than to call the legislature into special session to resolve unfinished business. *See* Kan. Const. art. 1, § 5.

38. As a direct result of the session restriction, legislative candidates from the Libertarian Party were unable to raise funds from organizations during the primary election period in 2016 because they held their nominating convention from April 29 to May 1 and the legislature did not adjourn *sine die* until June 1. *See* K.S.A. 25-4148(h). Indeed, nothing prevents the legislature from adjourning the legislative session until December 31 and then reconvening and adjourning *sine die* on that date, thereby preventing challengers from *ever* soliciting or accepting funds from lobbyists and organizations.

39. The session restriction may be based an important governmental interest but is overbroad; it unduly restricts the free speech and associational rights of candidates and their supporters and has a disproportionately negative impact on challengers. This Court must therefore invalidate the session restriction as a violation of the First and Fourteenth Amendments.

### Prayer for Relief

WHEREFORE, Plaintiff respectfully requests the following relief:

a. A determination and declaration that the practice of allowing candidates to transfer residual campaign funds from the general election period to the subsequent primary election period is unconstitutional in violation of the Fourteenth Amendment;

b. A determination and declaration that the session restriction, K.S.A. 25-4153a, is unconstitutional in violation of the First and Fourteenth Amendments;

c. A judgment and order expressly invalidating the Campaign Finance Act and any Governmental Ethics Commission rules, regulations, and advisory opinions to the extent the same are inconsistent with this Court's opinion;

d. Expedited consideration pursuant to Fed. R. Civ. P. 57;

e. The costs of this action; and

f. Any other relief this Court deems just and proper.

## Place of Trial

Pursuant to D. Kan. Rule 40.2(a), Plaintiff designates Topeka as the place of trial.

## Waiver of Jury Trial

Pursuant to Fed. R. Civ. P. 38, Plaintiff waives his right to a jury trial on all claims.

Respectfully submitted,

Steven Davis
*Plaintiff, Pro Se*
4100 W 24th Pl Apt E14
Lawrence, KS 66047
Tel: (913) 683-3719
Fax: (913) 273-0100
stevenxdavis@yahoo.com

10